So next case for argument Forsythe v. Colvin, Mr. Duncan. Good morning your honors, may it please the court. Dana Duncan appearing on behalf of Riley Forsythe. The sole issue on appeal is whether the ALJ erred in affording or how he afforded weight to the opinions of two treating source statements. In dealing with this case we're talking about a snapshot of the claimant's condition during the period from the alleged onset of disability to the date of the decision. Whether Mr. Forsythe would have improved or continued to improve following what was his third surgery right before his decision or not is not before the court and is subject to review by standards of Social Security law. I'm sorry what's not before us? I'm getting to the point here is that the judge repeatedly indicated that he seemed to be on track to be improving. That issue cannot be considered because there's no evidence as I'm going to continue to allege that it was clearly laid out that he was improving. It may very well be that his condition would have improved or likely to have improved but that's not really the issue it's whether he met the standards and whether the treating physician's opinion should have been adopted as of the date of the ALJ's decision. In this particular case we have a situation where Mr. Forsythe was injured when struck by a chain that snapped from a tractor, suffered a broken left ankle. He had first surgery in that summer. The injury happened on May 6th of 2011. He had surgery soon thereafter. A second surgery was done when he continued to have problems and pain with the ankle despite the fact that Dr. Eckerman, the treating podiatrist, indicated that he could start putting weight back on that ankle and starting to exercise it. He was diagnosed with having hardware pain and tendonitis. A second surgery was imposed. In the particular case the judge who made this decision, the ALJ, found that the treating source statements, and we have two of them, both from Dr. Eckerman, the podiatrist, as well as from Dr. Logan, his treating physician, indicated that he would not be able to sustain competitive employment. That was at the time, that was what around April, May 2012? Correct. Before the third surgery, right? Correct. Who was Dr. Stark? I think that was an editing, Your Honor. I did catch that. Who is she? Dr. Jane Stark? It's not a doctor that was relevant to this. In the summary of the argument? Yeah, it's a doctor that was not relevant to this case. It was an error or a transposition. Can I ask you, Mr. Duncan, just to see if we can narrow issues a little bit here? Mr. Forsythe's date of surgery had closed, correct? Correct. And the ankle injury came about almost a year later, right? Correct. Can we agree that the ALJ's decision was not erroneous for the time up through the ankle injury? We can not only agree, we can stipulate to that. Okay. It's really the ankle that becomes the lingering problem in your view? Correct. You know, there were issues that pertain to his back and to his shoulder. To be perfectly honest, based on my experience, it would have been very difficult for him to succeed based on those conditions alone. But once the ankle injury occurred, that ankle injury by itself could very well have satisfied Step 3, but that was not raised by trial counsel as to the fact that he had a weight-bearing joint and was unable to ambulate, at least during that period of time. In this particular case, what we're talking about, though, is we have two treating source statements. Now, I've asked the court and I've cited to the fact that while after completion of the first brief in this case, an article appeared in the Bar Journal for the Seventh Circuit indicating the history of the treating physician rule. And part of the argument I've made in this particular case is the difficulty in applying the treating physician rule and how it applies in general. This is a case where the ALG's significant finding is that he can discount the weight of Dr. Eckermann, the podiatrist, and Dr. Logan because the claimant had an improvement in medical condition. In fact, his condition improved so much by early 2012 that by 2013 he had to have a third surgery. That just seems so incongruent that it defies the logic of the ALG's findings. In this particular case, and maybe I'm being cynical, it appears sometimes as if ALG's, when dealing with treating physicians, find out what the RFC rule is or what they determined it to be and then give weight to the doctor if it agrees with their interpretation. In this particular case, both doctors indicated that he could not sustain work, that he was having too much pain and problem with standing, and that he was going to continue to have those problems. Can I ask you, Mr. Duncan? Yes. The record includes a number of records from chiropractic treatment. Correct. And as far as I could tell, most of those indicated that in terms of activity levels, this is from 2012 to February of 2013, his activities involved walking and weightlifting. What was going on? Well, I don't know exactly. All I can tell you is that he reported repeatedly in the other medical records that he was having difficulty in ambulating and was using a cane throughout most of those. Now the chiropractic records, as far as walking, I'm sure that he had and was involved in and exercise would have been part of the regimen that he would have been asked to undertake. Weightlifting is not something we usually see in disability records. It is to the extent of how you go about weightlifting, because weightlifting can be using of a knotless equipment and other such thing that isn't done in a seated position. Somebody like Mr. Forsyth, who's worked on a farm his entire life, is going to, in order to go back into the workforce eventually, which is ultimately the goal of Social Security, is to hopefully provide compensation while the person recovers or reaches a point where they do return or able to return to work, he's going to have to maintain his strength. So I know they're not necessarily incongruent. If the judge had a question about that, and this was raised and decided previously by this court in cases such as Shoggar, the judge should have asked about it. And Dinn did not. No, he did not. You just can't assume that this stuff is inapplicable or that it is applicable. There has to be some sort of question by the part of the ALJ to delve into that. Specifically, if you required counsel in these hearings to address every potential issue of credibility, we would have three and four hour hearings, which I think no one wants. The judge has already reviewed the file. If the judge has a question of something that says, oh, this guy may not be credible, then I think it behooves the judge to ask the question so that it can be addressed adequately. I see that I'm running out of time. Are there any questions per se at this time, for your honors? No, thank you. All right, thank you. I'll reserve the rest for you, Bob. Ms. Han. May it please the court, Lou Han on behalf of the Commissioner of Social Justice. The ALJ has not directly evaluated the treating source opinions, but Mr. Forsyth has been unable to point to any reversible error. The ALJ in this case reasonably and adequately explained the reasons why. I thought our discussion was really mushy. So, see, this question is a traditional problem. This business of giving significance to what people do around the home, in the home, as if that was predictive of what you could do in a 40-hour workweek. What's the basis for saying that because he helps his parents or something, he shouldn't even say what kind of help he gives, but he gives some help to his parent and his son and therefore he he can work? What's the sense of that? Respectfully, Your Honor, that's not what the ALJ said and I don't believe the ALJ said that those activities meant that he could perform full-time competitive work. But in one of the... No, that was one of the reasons she gave for discounting the medical testimony was that he helps around the house. Now, we have pointed out in numerous cases that the fact that you do stuff around the house doesn't mean that you can work a 40-hour week in someone's business or factory. That's true, Your Honor, but Dr. Logan, in one of his opinions, actually said that Mr. Forsyth cannot do activities of daily living. Now, that... Cannot do what? Cannot perform activities of daily living. It was quite restrictive and his statement in that opinion actually suggested he was precluded from doing any activities, any daily activities. What was the date of that opinion? That opinion, Your Honor, I believe was from 2000... December 2012. That was... And how... Where was that in terms of the surgery sequence? It was after the first two surgeries in the first part of 2011, after the ankle fracture, before the hardware removal surgery that occurred the month of the administrative hearing, February 2013. So this is about two months before the hearing when, whatever shape he's in, he has to go back into the hospital for more surgery, right? That's correct. I mean, we've got a lot of changes going on in his condition, right? Correct. And... During that period of time, from September 2012 through February 2013, he was walking and lifting weights? Yes, and as Judge Hamilton pointed out, that was in the chiropractic notes, although we would like to note that that's... Those are not notes that the ALJ discussed in his decision. The ALJ did discuss other Dr. Eckerman said that he was on his ankle a lot, and Mr. Forsythe actually had quite a bit of activity. That's... From your standpoint, it's irrelevant whether he can walk, because you're just talking about sedentary jobs for him. Correct. When he sits. He doesn't have to walk. He doesn't need legs. Let me ask you about that. The vocational expert says he can be a production worker, a cashier, or a... What was the third one? An information clerk. Now, what's a production worker? Well, Your Honor, there are a lot of DOT listed jobs, production clerk. Production worker actually is not a particular job in the DOT, but it's clear from the vocational expert's testimony, which was unchallenged at the hearing, unchallenged at the district court, or challenged here. It's never challenged. It's always phony. He didn't break down production workers into different categories. He just said production worker. That's correct, and I would be speculating... Well, that could be a person working in a factory. But the V.E. was responding to the hypothetical question. No, there's no but about it. He says there are what, 2,000 or 1,000, 2,000 jobs. He says there are 1,000 production worker jobs in Wisconsin. Sounds very low, actually, but that's what he says. He doesn't define production worker. He doesn't say, well, these are people working on an assembly line, or people who are engaged in actual manufacture. Right? I don't see how most types of production... I mean, those are many types of production are tough jobs. You know, you're actually standing on your feet for many production jobs, and I don't see how the vocational expert can be permitted to use categories which include many jobs that this person can't perform. Well, Your Honor, the vocational expert was responding to a hypothetical question that didn't involve the standing and some of the other things in factory work. But what the response was that this person can be a production worker, and there's no... Vocational expert said this person can engage in production of, I don't know, cat toys, because you just sit and you put together little things with your fingers. That's very different from being on... We've had cases involving poultry processing, where you stand on an assembly line, you chop up chickens as they come by, Your Honor. That's a tough job, dirty and noisy and difficult. But the vocational expert makes no differentiation among these jobs. The vocational expert, through his expertise, experience in placing people in jobs, was taking the hypothetical question, which included sedentary RFC with the additional limitation of the right overhead reaching, and identified those as three representative jobs. And the ALJ wasn't... Representative of what? Representative of the types of jobs that someone of that RFC could perform. But only some production jobs within the capacity of a person like this. Approximately a thousand. Not all production jobs. But according to him, there are only 1,000 production jobs in Wisconsin. He can't perform all those. So if he can only perform a hundred, well, that could make a dramatic difference in the outcome of the case. The number was 1,000, and that was the subset of the jobs. It was not a subset of... Not a subset of production jobs. Those, that's the production jobs in Wisconsin. All the production jobs, so far as appears from the opinion. And the ALJ relied on those three... Yes, but how could the ALJ rely when the 1,000 jobs, production jobs, may well include many jobs that he can't perform? So the only jobs that should be counted are the ones he can perform. And Your Honor, without belaboring this, that is that 1,000. How do you know? He didn't say that. He was giving a job number based on that hypothetical question, and that job number, the 1,000 for this particular job that we're discussing, were all of the jobs that someone matching Mr. Forsythe's functional abilities were able to perform. And we would note that... Where did he get the 1,000 figure from? From his experience and from... Well, wait a minute. His experience. He goes around Wisconsin counting people? Vocational experts. How do you learn the number of jobs in the state by experience? Vocational experts place individuals in jobs, and they have experience in these kinds of categories of jobs. No, no. How do you get a number? The roundness of these numbers is very suspicious. How do you get 1,000? How do you find out there are 1,000 production jobs in Wisconsin? Your Honor, personally, I am not sure about the sources and the Bureau of Labor Statistic Publications and other things that a vocational expert would look at. But we'd like to note that the most recent cases that this circuit has issued on the issue of vocational experts didn't expressly go through the procedures of overruling what is still good precedent in McKinney v. Barnhart and Donohue v. Barnhart. In those cases, an ALJ is entitled to rely upon unchallenged vocational expert testimony. In this case, at the hearing, and at all phases in this appeal and this litigation, there's been no indication that there's some kind of unreliability in the methodology. Oh, yes, there are many indications. One of them is that apparently, very often what the vocational experts do, they only have very gross numbers for jobs, for large categories of jobs. And then there are subcategories. So, what they'll do is they'll divide the total number of jobs by the number of subcategories, thus assigning an identical number of jobs to each of the subcategories. Now, that obviously is totally improper, right? Because it assumes the number of jobs that the applicant can perform. On the assumption, obviously false, that all the subcategories have the identical number of jobs. Could I take you back to the reasons for discounting the doctor's opinions, treating doctor's opinions? We've got phrases from the medical records like, quote, pretty active and unspecified daily activities. Is there anything in the record that gives us a little elaboration on what those might mean, so that it would justify discounting what both treating physicians say? Well, with regard to the activities, we have Mr. Forsythe's own testimony from the hearing, and he did describe some household work, including vacuuming, sweeping dishes, doing his own laundry as well as the laundry of his... Doing what? ...and for his eight-year-old son. Okay. And what else? Which, again, the ALJ didn't explicitly equate those kind of activities to full-time work. And he talked about treatment notes, an MRI, pardon me, an X-ray from May 2012 that showed a well-healed ankle fracture and other things. And this wasn't solely... Right. It's in May 2012, and that's when both doctors are saying, this guy can't work, at least right now. How about the quote, pretty active? What's meant by that? Those were the doctor's phrases. Was there any exploration of what was meant by that? Again, only insofar as Mr. Forsythe testified to those aforementioned activities. But those notes came, as Your Honor's pointing out, at the same time as these restrictive opinions. And then finally, as late as March 2013, the same month as when this ALJ's decision was issued, was when Dr. Eckerman issued some notes following the final surgery saying that Mr. Forsythe was approved for light duty and light activity. And, in fact, this ALJ found an even more restrictive exertional level of sedentary work. I'm sorry, that last opinion was dated approximately when? It was a treatment note, Your Honor, from March 2013, the month after the hardware removal surgery and a month after the hearing. And Dr. Eckerman, the podiatrist, said that he approved Mr. Forsythe for light work slash activity. Okay, that was right about the time of the ALJ's decision? That was the same month, Your Honor. Okay, yeah. That's correct. Thank you. Is the notion that he can do any sedentary work? With the additional limitation, yes, Your Honor. On the right hand reaching? The overhead reaching right hand, correct. That's the only limitation? Right, because of the history of the right rotator cuff injury, which also that, as well as the left femur break and the kneecap hardware implantation, all happened many years before the alleged onset date in June 2010. Although, if we take it today that Mr. Forsythe has stipulated that that's not the correct date, it's actually the date when he had the tractor accident in March 2011. It's even further before that. And the state agency reviewing doctors, Drs. Shaw and Chan, found that he was limited to sedentary work starting in May 2011. This ALJ, in fact, actually found sedentary as the limitation for the entire relevant period, going in this decision as far back as the original alleged onset date of 2010. Okay, well thank you very much, Ms. Han. Mr. Duncan? A few points. I guess just in follow-up to Judge Posner's statements as far as the vocational, the numbers come from what is called the SOC, which is a number derived from the census code that the Department of Labor collects. In a given SOC code, there may be as many as 53 occupations that range from sedentary to heavy. And the judge, when the V.E. is testifying to the fact that it's a representative job, it's representative of all of the jobs that are in that category of that exertional limitation. So if it's a sedentary job, if there are 15 sedentary jobs, then that is a representative of the sedentary jobs. How they arrive at those numbers, I could probably have you 15 different vocational testimony or transcripts of V.E. testimony and 15 different ways that they say they collected or calculated it. In this case, however, the focus is on the residual functional capacity finding, right? Correct. Now, going to that, as I've indicated before, there's supposed to be a two-prong evaluation in these cases. One is whether it was well-supported and the diagnostic techniques supported it, and then whether it's not inconsistent, which the language of the regulation grates on my ears because of a double negative, which makes absolutely no sense. In other words, is it consistent? In this particular case, only then do you go and establish no controlling weight. Then you have to establish the appropriate weight. And in that particular case, the appropriate weight is determined by application of the checklist. There is no application of the checklist. The judge kind of implies a couple of things. He talks about daily activities. It does not equate to full-time work. He talks about raising his children and basically implies that you can't get disability unless you call social services to remove your children because you're not supposed to take care of them if you have them. So I'm out of time if there are no other questions. I have a question. Today, what is his most significant impairment? To be perfectly honest, Judge, I can't tell you that. I was aware of the fact that his condition may have very well improved and that he may have gone back to work the last time I was talking to him. I know that was what he was working towards. The fact that Dr. Eckerman released him on life duty indicated there was some improvement. The judge could very well have granted what was called a closed period if, as of the date based on the record, did not have to deny. These cases are always subject to 12-month review. Even if the judge would have approved Mr. Forsythe, it would have been subject to review. Congress authorized a significant number or increase in funding for such reviews, and they're being done on a regular basis. So that's not what the issue is. The issue is the time frame of where the ankle injury happened and the date of the decision. Okay, well, as of the date of the decision, what was his worst condition? It was his ankle and the pain associated with that. Even sedentary work does require some amount of being able to get up and move around and take care of files. In this particular case, Dr. Eckerman indicated that he did not even have the ability to do that for up to an hour over an eight-hour time frame because of the pain associated with it. The fact he was also using a cane at the time throughout most of this, which is not in the RFC at all from the judge, which impacts under SSR 96-9P whether you can perform sedentary work because basically then you're carrying stuff with one hand because the other hand you're having to utilize a cane. When you also add to the fact that he's got a problem with his shoulder, then the question becomes was he able to use the cane with the right hand that he has a problem with, and basically then is he further limited to not being able to carry anything. There are just lots of holes in this case, lots of holes with the judge's decision, and I ask for reversal. Is he right-handed? I believe that was what the testimony was. Okay. Well, thank you very much, Mr. Duncan and Ms. Han. Thank you. And we'll move to our next case.